MARILYN E. BEDNARSKI, SBN 105322
Email: mbednarski@mbllegal.com
McLANE, BEDNARSKI & LITT, LLP
975 East Green Street
Pasadena, California 91106
Tel: (626) 844-7660
Fax: (626) 844-7670

PAUL J. WATFORD, SBN 183283
Email: pwatford@wsgr.com
WILSON SOSINI GOODRICH &
ROSATI
953 E. 3rd Street, Suite 100
Los Angeles, California 90013
Tel: (323) 210-2951

Attorneys for Defendant MILTON C. GRIMES

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> MILTON C. GRIMES, <br><br> Defendant. | Case No. 2:24-CR-190-SB <br><br> **DEFENDANT'S POSITION REGARDING PRESENTENCE REPORT AND RECOMMENDATION LETTER EXHIBITS 1 TO 5 & 5A** <br><br> Hearing: February 11, 2025 <br> Trial Time: 8:00 a.m. <br> Location: Courtroom of the Hon. Stanley Blumenfeld Jr. |

The defendant Milton Grimes, through his counsel of record Marilyn E. Bednarski and Paul J. Watford, presents his sentencing position and exhibits regarding the Presentence Report and Recommendation disclosed in this case. Dkt. 37 & 38.

Respectfully submitted,

DATED:        January 21, 2025

MCLANE, BEDNARSKI & LITT, LLP

By: */s/ Marilyn E. Bednarski*
Marilyn E. Bednarski

WILSON SOSINI GOODRICH & ROSATI

By: */s/ Paul Watford*
Paul Watford

Attorneys for Defendant

1

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     OBJECTIONS TO PSR.........................................................................................1

III.    MR. GRIMES DEDICATED HIS LIFE TO FIGHTING INJUSTICE AND
        UPLIFTING OTHERS ........................................................................................2

IV.     COLLATERAL CONSEQUENCES ..................................................................12

V.      GENUINE REMORSE........................................................................................13

VI.     MR. GRIMES DID NOT LIVE A GREEDY OR LAVISH LIFESTYLE.......15

VII.    TRAUMA FROM LOSS OF SON.....................................................................17

VIII.   AGE AND HEALTH ..........................................................................................18

IX.     APPLICATION OF THE 3553 FACTORS ........................................................18

X.      CONCLUSION...................................................................................................20

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

The presentence report accurately calculated the advisory guidelines and recommends a below guidelines sentence of 18 months. This brief argues that the voluminous mitigation evidence in this case weighs heavily in favor of a probationary sentence. This brief argues that the facts and the law support a downward variance of five levels from the total adjusted offense level 16 to level 11, in Zone B and imposition of a sentence of probation with home detention of 9 months pursuant to U.S.S.G. § 5C1.1 (e)(3), no fine, and a special assessment of $100. The undersigned expects the parties to agree to a restitution amount prior to sentencing.

Supporting the request for a probation sentence, the undersigned files evidence in the form of: Mr. Grimes's Letter to the Court (Exh. 1); sixty character reference letters (Exh. 2); an index of those letters identifying particularly relevant information (Exh. 3); a Declaration from forensic analyst Knudson addressing a financial issue (Exh. 4); and by manual filing, a flash drive containing a 9.5 minute video (and transcript) showing Mr. Grimes's extraordinary contributions to the legal profession and Mr. Grimes in his community and at the Trial Lawyer's College (Exh. 5 & 5A).

## II.     OBJECTIONS TO PSR

### PSR ¶2

The presentence report correctly reports that Count 1 charges the evasion of tax in violation of Title 26 U.S.C. §7201. However the dates are incorrect. Count 1 charges the evasion from "at least May 2014 though in or about April 2020." See Indictment, Count 1, ¶ 15; Dkt. 32-1 Factual Basis for Plea Agreement, at p. 3: 19-21.

### PSR ¶¶ 20, 29, 34

The presentence report in three places describes that "Grimes purchased approximately 238 checks totaling $16 million from May 2014 through April 2020 from money deposited into his CTA, IOLTA and MC APC account."

The defense wishes to correct a potential misimpression. While it is a technically correct total of all 238 cashier's checks that Mr. Grimes purchased was $16 million, that figure does not accurately support the conclusion that Mr. Grimes had that amount available for payment of IRS tax liens. Att. Exh. 4, Decl. Mr. Knudson, financial analyst. The $16 million figure is an exaggerated figure. Simply totaling the sum of the 238 cashier's checks fails to take into account that $7,062,000 of that sum represents checks purchased with "recycled funds," that is, not original money. *Id.* Of the remaining $11,971,422.80, $4,367,391 was paid in alimony to Elouise Grimes, and $512,643 to vendors of the law practice. *Id.* The remaining $4,909,000 in cashier's checks were paid to Mr. Grimes. *Id.*

**PSR ¶ 68**

Rebecca Little is the biological daughter of Mr. Grimes and Ms. Anna Little, *not*, as the presentence report reflects, Anna's daughter from a "previous relationship."

**PSR ¶ 91**

The "Zillow" value of his residence/office in South Central listed here, $1,624,200, is not equity, and will not reflect the numerous liens on the property, nor the fact the building has not been renovated in decades.

## III. MR. GRIMES DEDICATED HIS LIFE TO FIGHTING INJUSTICE AND UPLIFTING OTHERS

Mr. Grimes's life has been defined by his efforts to contribute positively to social justice. His older sister Regina Thomas describes his "humble beginnings of working in the fields of North Carolina at the age of 6 years old, picking cotton and hauling tobacco on his grandfather's farm," and that he "grew up in those turbulent years of discrimination and segregation, [   ] one of few from his segregated high school in Virginia to graduate, attend college and ultimately pursue a career in law." Exh. 2, pgs. 109-110, Thomas, Regina Letter. He used his education, his intellect and

his law license to fight for disadvantaged and underserved people. His ex-wife Elouise Duncan Grimes writes:

> "Milton's background of being raised by his sharecropper grandfather and his understanding of those from underprivileged and underserved communities placed him in a unique position to be a unifying force. He was always grounded in the belief that he would be the voice to preserve the rule of law. He would be the advocate for the underrepresented. Driven by his frustration with the systemic injustices faced by Black people, particularly young Black men, and his dissatisfaction with the representation provided by organizations like the Black Panthers and the NAACP, he pursued a career in law. Milton saw the legal profession as a powerful tool in the fight for civil rights and equality."

Exh. 2, pgs., 35-41, Duncan Grimes, E. Letter.

Mr. Parham, the sitting President at California State University, Dominguez Hills, has known Mr. Grimes for 37 years. He writes:

> "Whenever he is called upon to try and right a wrong, he never waivers in his commitment to justice, never hesitates in helping the helpless, and never recoils at tending to those who live their lives at the margins of society. . . .
> But the substance behind the man is more revealing than the persona that is projected in the media or his profession. Grimes is driven with a hunger to make things right and level the playing field for those who may find or perceive that society's platforms are often teetering or skewed towards unfairness and injustice. To me, that has been his superpower if you will; he is one of the most committed, honest, culturally conscious, credible, authentic, and trustworthy individuals that I know."

Exh. 2, pgs. 76-77, Parham, T. Letter (p.1-2).

His commitment to promote social justice was evident as a law student in the early 1970s, where he was "know[n] as a community activist and very socially

conscious young man" who encouraged others to volunteer in a legal services program, a tutoring program for legal service clients and their children, and was active in the Black Law Students organization advocating student issues, all while being a husband parent and student himself. Exh. 2, pgs. 51-52, Hambrick, D. Letter.

He practiced law for 50 years concentrating on criminal defense and civil rights. Most of Mr. Grimes's cases were not high profile; his case load largely consisted of murder cases (50 of which he tried)  including numerous death penalty cases, and juvenile cases. David Sandberg, retired private investigator, worked with Mr. Grimes on many homicides and capital murder cases. He writes about Mr. Grimes:

> "Often representing clients charged with horrendous crimes, Milton always led the way to finding the silver lining in the facts and most importantly the person. He developed respectful relationships and presented honest defenses. I witnessed him gain the respect of his peers and the Judges. He was difficult to work with at times because he was so demanding."

Exh. 2, pgs. 84-85, Sandberg, D, Letter (p1).

Sixty people have written letters to this Court which convey his extraordinary qualities of compassion for his clients, and courage to represent them in the toughest cases. Those letters are attached for this Court's consideration, along with an index summarizing particularly relevant passages. Exh. 2, Collected Reference Letters; Exh. 3, Index of Collected Letters. And see Exh. 5, the Sentencing Video (and corresponding transcript, Exh. 5A). His daughter Danita Stewart describes her father's commitment to clients throughout her life:

> "There is no one that has given more of his time, assistance and resources than my father, Milton Grimes. My earliest memories since childhood are of him constantly and consistently rescuing others - ensuring them a better life, helping them to unload stress, or making certain that the justice system treated them fairly."

Exh. 2, 98-99, Stewart, D. Letter; Exh. 2, pgs. 21-23, Clarkson, D. Letter (p. 2) ("He worked hard to understand the way the client saw and experienced their life . . . He found ways to put his arm around the person to let them know that he cares.").

Some of his cases were "high-profile," a handful even on a national level. They are worth discussing here because of their broader impact on social justice, such as to increase understanding and compassion towards mental illness, police brutality, and racism. One example is Mr. Grimes's groundbreaking work in an Orange County Superior Court in 1988 raising postpartum psychosis as a defense on behalf of his client Elizabeth Massip, who killed her 6-week-old infant. The defense was the first of its kind in Southern California and only beginning to be recognized around the country. After a jury found her guilty of second-degree murder, the judge reversed the verdict and found Ms. Massip not guilty by reason of insanity. Ms. Massip went on to lead a healthy life, and years later remarried and bore healthy children with the assistance of hormone treatment. See Letters from Edward Delano, and Sheryl Massip Smith, Exh. 2, pg. 29 & pg. 95.

Another noteworthy case was Mr. Grimes's successful representation of Rodney King in the 1994 civil rights trial against the officers that beat him:

> "As one of the first Black attorneys to take on such a high-profile case, Milton stood firmly in the face of both public scrutiny and personal risk. The FBI informed Milton of credible threats made against him and his family as well as to King. . . . Milton's courage in that case, as in so many others, has inspired countless individuals and families to believe in the possibility of justice in a world that often seems stacked against them."

Exh. 2, pgs. 35-41, Duncan Grimes, E. Letter.

Mr. Grimes's use of his law license in the King case led to long-lasting reforms in policing in minority communities, such as de-escalation training and body cameras that have reduced police brutality nationwide. Exh. 2, pgs. 88-90, Shenkman, K. Letter;

and see, "Long After Rodney King We Need Transparent Policing More Than Ever" (2016) by Peter Bibring, Senior Counsel at the ACLU found at https://www.aclusocal.org/en/news/long-after-rodney-kingwe-need-transparent-policing-more-ever (discussing the changes that resulted from the King case at LAPD and other police departments including increased authority for civilian oversight, occasional discussion of stark racial disparities, and use of technologies from TASERs to body cameras). Attorney Kevin Shenkman writes:

> "There is no way to know how many infants and new mothers have been saved, and how many incidents of police brutality have been prevented, over the past 30 years as a result of Milton's work. His commitment to fighting for civil rights expands beyond criminal defense and representing persons abused by government officials, to standing up for boys against discriminatory enforcement of Little League rules to voting rights cases."

Exh. 2, pgs. 88-90, Shenkman, K. Letter.

In 1996, Mr. Grimes represented Manual Salazar, a man sitting on Illinois' death row, whose case was remanded for the retrial of the murder of a police officer in 1984. Attorney Cyndy Short,  a capital lawyer for 30 years, writes:

> It is an awesome responsibility to represent anyone who is facing this ultimate punishment. It takes lot from you. You must give up part of yourself. The sacrifice is painful. He took what he had learned . . . and he went into court and he saved this young man.

Exh. 2, pgs. 91-92, Short, C. Letter. Retired Lieutenant Colonel Vokey, a military lawyer for many years, and former student of Mr. Grimes writes:

> Milton is a lawyer who has stood up for many, many people over the years. And while he has been successful in numerous high-profile, well-known cases, it is his representation of the little-known defendants that has impacted me the most. Milton has often defended the damned or discarded members of society. He has

represented those accused of the most horrendous crimes. Yet Milton has always shown his clients compassion and love and represents them with the utmost diligence.

Exh. 2, pgs. 113-114, Vokey, C. Letter.

Mr. Grimes's practice was not lucrative, with the exception of a handful of years amidst the 50 years. Numerous letter writers talk about his reputation amongst peers as working for free or low pay. See, Exh. 2 pgs. 30-31, Dolan Letter (''[has] reputation for never turning away someone who required legal help simply because they could not afford to pay.''); Exh. 2, pgs.1-4, Abarr, M. Letter ("represented many for an inordinately low fee or for no fee in others." ) Exh. 2, pgs. 98-99, Stewart, D. Letter, daughter, psychologist  and professional collaborator, (relating how he "represented others for a mere fraction of what he deserved,. . ."); Exh. 2, pgs. 42-43, Dunlap, D. Letter (describing Mr. Grimes's long and hard-fought representation for a greatly reduced fee of a disabled man charged with a serious crime); Exh. 2, pgs. 5-6,  Alex. M., Letter, ("often he works pro bono. In all cases, he pours his heart and energy into the defense."); Exh. 2, pgs. 82-83, Ross, L, Letter (who hired Mr. Grimes to represent her great-grandson, a juvenile, and even when fee ran out, he continued, never asked for more money, and provided him with guidance and advice.); Exh. 2, pgs. 26-28, Davis, E. Letter (". . .will continue to lead a life of helping others. He's done that when no one was looking.").

Besides his direct representation of clients, Mr. Grimes has had a tremendous impact on the legal profession. He has dedicated himself to the next generation of legal professionals. Exh. 2, pgs. 30-31, Dolan, J., President Imperial Valley Law School, Letter; Exh. 2, pgs. 78-79, Parker Letter, ("I've witnessed Milton mentor Attorneys on their "bedside manner" in dealing with their clients, making sure that the Attorney puts themselves in their clients [sic] shoes, then walk several miles in them. To be transparent with your clients.").

Without compensation, for the past 25 years, Mr. Grimes has served on the board and taught at the Trial Lawyers College "TLC" "devoting hundreds of hours of his time helping younger lawyers become better lawyers and people." Exh. 2, pp. 1-4, Abarr, M. Letter. Numerous lawyers including faculty members from the TLC have written speaking of his extraordinary commitment to "bettering trial lawyering on behalf of the disadvantaged and injured and his great contributions to the young men and women who through his mentorship have become better people. See Exh. 2, Collected Reference Letters (letters from Michael Abarr, Maren Chaloupka, Don Clarkson, Amanda Harber, Rick Kammen, Joshua Karton, Louise Lipman, Frank Mungo, Kim Savo, Cyndy Short, and Ernest Warren Jr.).

Numerous former students have written about how Mr. Grimes inspired them and fundamentally changed their effectiveness as trial lawyers. See e.g., letters from Tyler Ayres, Katherine Berger, Maren Chaloupka, Francisco Duarte, Dante Gomez, Jeffrey Larrimore, Gary Wenkle Smith, Jonathan Stokes, Emanuel Thomas, Andre Townsend, Colby Vokey and Zaki Zehawi. Exh. 2, Collected Reference Letters. Several attorneys of color write about how Mr. Grimes gave them confidence to believe in themselves. Mr. Duarte writes:

> As one of few Hispanics practicing law in the mid-90s in Washington courts, I was uncomfortable in my own skin. I was embarrassed about my accent, legal writing skills, and my non-traditional appearance among most Washington practitioners. More than once, folks assumed I was the accused, or a court interpreter, and not a licensed attorney. Because I had so many hang ups, I worked hard to emulate others in my profession. Still, I was never genuinely me. That changed in earnest when I met Milton.
>
> Milton helped me to see that scripts and public façades were not genuine ways to connect with others, like my clients, jurors, or opposing counsel. Through Milton's leadership, guidance, and example, I uncovered my own power and

8

found my authentic voice in professional dealings. I have witnessed Milton

orchestrate identical transformations for so many folks from varying

backgrounds and experiences across the country.

Exh. 2, pgs. 32-34, Duarte, F., Letter. Another young lawyer, Emanual Thomas,

describes how important Mr. Grimes's mentorship was to him as a lawyer of color

from South Central Los Angeles:

To have Milton mentor me, encourage me and sometimes scold me is such a

blessing. People that grew up in my neighborhood don't always have people like

Milton Grimes in their life. Fortunately, I did.

Milton Grimes is a treasure to the community and to the legal profession. His

knowledge and caring nature are what is needed in our profession to mentor

future lawyers no matter their status in life or where they grew up.

Exh. 2, pgs. 107-108, Thomas, E. Letter (p2); Exh. 2,pgs. 111-112, Townsend, A,

former DFPD ("Milton's presence in my life has been a gift. And he has filled a void

that very few attorneys in Los Angeles even attempt to address: offering selfless

guidance, mentorship and support to other professionals, particularly those from

underrepresented backgrounds like myself") Exh. 2, pgs. 130-131, Sarmiento, V.

Letter, 15 year public servant, ("My own memories are of a man that taught two (2)

young Latino immigrant kids the importance of the law, justice and fairness.").

Mr. Grimes simply takes people under his wing when he finds out they need

care and compassion. Brady Skinner, III, a 2018 Student of Mr. Grimes, writes:

"While on my deathbed, having surgery after surgery, Milton made time for me

every night to talk to me. We spoke throughout my recovery; we talked once I

was released from the hospital; we spoke every single night until I was better.

And we talked some more. . . .

Milton was by my side every day during the roughest tenure in my life. He not

only talked cases with me, but Milton talked life with me. Prioritizing a man he'd

only known for a couple of years. As often as we spoke, he would only end our conversations when he was having dinner with his family or about to watch a movie with his daughter. Milton made time for me. Milton made me family by the way he treated me."

Exh. 2, pgs. 93-94, Skinner, B., Letter.

Attorney Kim Savo, a former 20 year Deputy Federal Public Defender in Los Angeles and one time student of Mr. Grimes tells this story:

"Later, when I was on the Federal Public Defender hiring committee, we decided not to hire a very inexperienced Black lawyer. I thought he showed great promise and wanted someone to give him a chance. Milton was the obvious person to call. Not only did Milton give this young man a job and include him on cases, Milton introduced him to various Superior Court judges on the bench. Milton didn't just give him a chance; he put him under the umbrella of his own reputation."

Exh. 2, pgs. 86-87, Savo, K., Letter; Exh. 2, pgs. 105-106, Stokes, J. Letter (met Mr. Grimes through a family friend, Grimes offered him a clerkship when he heard he was interested in the law, mentored and protected him); Exh. 2, pgs. 130-131, Sarmiento, V. Letter (discussing Mr. Grimes's tutelage of his sister Vicki Sarmiento, a Latino immigrant, to her becoming a celebrated civil rights lawyer).

For decades he has extended a helping hand to at risk youth in his community. Isaac Curtis has known him for 50 years, and is a former professional football player who at Mr. Grimes's request would talk to kids in the community. He [Mr. Grimes] wanted me to share that there are different roads to success, but most of them start with an education. Exh. 2, pgs. 24-25, Curtis, I., Letter. His influence was key to Mr. Curtis's creating a non-profit foundation, the "Curtis-Breeden Foundation" dedicated to helping kids in underserved communities achieve educational success. . . . Through our Foundation we have helped thousands of young men and women." *Id.*

10

Clyde Autin, a software engineer and former client describes how Mr. Grimes changed the direction of his life:

> Looking back, I can honestly say that Milton's actions didn't just help me avoid a harsh punishment—they gave me the chance to build the life I have today. At 19, I was at a crossroads, and had it not been for Milton, my life could have spiraled into something unrecognizable. . . .
>
> Milton's dedication extends far beyond the courtroom. He is a pillar of his community, always willing to mentor young people and offer a helping hand to those in need. I am not the first young man he has helped, and I know I will not be the last. His belief in redemption and second chances is not just a professional philosophy—it's how he lives his life.

Exh. 2, pgs. 7-8, Autin, C., Letter. Forty-five years ago, Rick Ward was a high school student who, with the guidance of Mr. Grimes, earned an athletic scholarship to attend college and play football, which paved the way for his career in telecommunications. He writes:

> "Milton C. Crimes is not only a phenomenal attorney but also a beacon of hope for those in need. Affectionately known as Grimes, he has profoundly influenced my life and the lives of many others, particularly young men like me, Andrew Page, Robert Powell, Reggie West and Tim Smith. As young men Grimes dedicated himself to mentoring us by organizing four college tours aimed at exposing us to new opportunities and perspectives. The trip to Eugene, Oregon, resonated deeply with me, it was a pivotal moment for personal growth. Grimes played a crucial role in influencing the University of Oregon to offer Andrew an athletic scholarship, however emphasizing that Andrew and I were a 'package deal.' This transformative experience opened doors in my life, and to this day I am forever grateful for Grimes's commitment and belief in me."

11

Exh. 2, pgs. 115-118, Ward, R. Letter. Because of Mr. Grimes's influence, Mr. Ward has given it back to the community:

> I recognize the profound impact he has had on my life through his mentorship, friendship, and brotherhood. Inspired by his example, I have dedicated myself to serving others by coaching, hiring, and mentoring young men and women.

Exh. 2, pgs. 115-118, Ward, R. Letter.

Coach Garrett, the athletic director and head football coach at Crenshaw High since 1988, writes about how Mr. Grimes has saved the futures of two of his players charged with crimes as young men. Exh. 2, pg. 47, Garrett, R. Letter. In 2000, Mr. Grimes obtained the dismissal of the case for one of those players who was charged with possession of marijuana on campus and the young man turned his life around, earned a scholarship to the University of Oregon, and later played in the NFL. Mr. Garrett writes:

> Beyond his legal work, Mr. Grimes has been a tremendous supporter of Crenshaw High School's football program and the greater community. [The school is within a mile of Mr. Grimes's home and office.] He and his family have attended many of our home and away games, sponsored athletic banquets, provided equipment and pre-game meals, and served diligently as a mentor to our players. His contributions have made meaningful impact on countless young lives, and dedication to our community is deeply appreciated.

Exh.2, pg. 47, Garrett, R. Letter.

## IV.    COLLATERAL CONSEQUENCES

This prosecution has brought Mr. Grimes great shame and embarrassment, disgrace and the loss of reputation. There have been multiple press releases about the case. After the Indictment was filed, the State Bar posted a "consumer alert" on his state bar profile announcing that he was charged with a felony. PSR p. 16 fn5.

A crushing consequence of this case will be the loss of his more than 50-year-old bar license and career. His law practice was much more than a profession, it was his calling. Exh. 2, pgs. 35-41, Letter from Grimes, Elouise Duncan; Exh. 2, pgs. 109-110, Thomas, Regina Grimes Letter, ("It is his calling to serve others and to have a meaningful impact by providing a framework through which he can contribute to the development of fair and equitable solutions that affect individuals and communities."); Exh. 2, pgs. 21-23, Clarkson, D., Letter ("The loss of his license and practice are devastating to him personally and to his place in society. He has done so much for all of us especially black and minority persons).

## V.    GENUINE REMORSE

Mr. Grimes's remorse for the conduct that brought him before this Court is genuine. He has expressed his remorse directly to this Court through his plea and the attached letter in which he describes the decisions he made that brought him to this point, taking full responsibility and expressing his knowledge of the gravity of the crime. Exh. 1, Milton Grimes Letter to Court.

He also expressed his responsibility and remorse to friends, family, attorneys and former clients. Exh. 2, pgs. 32-34, Duarte, J. Letter ("He did not sugarcoat or minimize his misdeeds. Instead, he expressed genuine remorse."); Exh. 2, pgs. 9-11, Ayers, T., Letter ("his remorse and regret are embedded in every word, gesture, and grimace"); Exh. 2, pgs. 18-20, Chaloupka, M., Letter ("I can see that he is ashamed."); Exh. 2, pgs. 42-43, Dunlap, D, Letter, Deputy Sheriff, Og. Cty for 30 years (I know he is ashamed of what he has done and it has been a very humbling experience . . .); Exh. 2, pg. 29, Delano, E. Letter ("he made no excuses about it [tax evasion] to me."); Exh.2, pgs. 58-59, Kammen, R. Letter (his admission to me was without reservation); Watford, Walter ("In my discussions with him he has expressed deep regret and remorse, as well as the shame and embarrassment, . . ."). His friend of 55 years and psychologist Virginia Watford writes:

> "This case has had a profound effect on him. I have noticed a decided change in his demeanor. In the past he has been a positive, upbeat and energetic person who looks and acts younger than his actual age. Recently 1 have noticed that he is less confident and more subdued. He looks older and tired."

Exh. 2, pgs. 121-122, Watford, V. PhD, Letter, (p.2).

His daughter Danita, the psychologist, writes:

> "He has attempted to be strong throughout this process, but it has certainly taken a tremendous toll. I have witnessed my father's shame about this conviction wear on him mentally, and the regret consume him. It is profoundly unfortunate that this is how his career will end."

Exh. 2, pgs. 98-99, Stewart D., Letter. Louise Lipman, a psychologist who has taught and worked with Mr. Grimes for 16 years writes:

> Recently while working on a case together, Milton and I had a conversation about his legal issues. He made me aware of the fact that he had been convicted of tax evasion in federal court and that it was a felony. It was not an easy conversation to have as Milton had to own his shame and remorse for what he had done. He told me the truth without trying to defend his actions, even though I know he was afraid I would judge him. . . .

> As a mental health professional, I know that Milton is ashamed of what he did. He feels like he let people down who trusted him and believed in him. I know he wants to take responsibility for making bad decisions and allowing his pride to get in the way of asking for help when he needed it. I believe he will learn from this situation and that moving forward he will continue to try and make a difference in this world, one person at a time, authentically and following the law. He will be honest and forthright about who he is, has been and what he has done. In doing so he will be a role model for taking responsibility and owning one's actions, as well as being a role model for redemption.

Exh. 2, pgs. 72-73, Lipman, L. PhD, Letter (p.1-2).

## VI.  MR. GRIMES DID NOT LIVE A GREEDY OR LAVISH LIFESTYLE

Mr. Grimes filed his federal tax returns and accurately stated his income. He did not falsify income or expenses. He did not have foreign bank accounts, luxury assets, or take lavish trips. He lived and worked in his community, in a modest building in South Central Los Angeles, with his office downstairs and apartment upstairs. It was never renovated. He lived a modest lifestyle.

Over the almost twenty year period covered in the presentence report (tax years 2002 to 2023), Mr. Grimes's income varied widely year to year. See PSR at 13. By 2002, he had been practicing for over 30 years, and was 57 years old, but his earnings were still modest. For example his taxes for the year 2002 were $33,386, for 2003, $48,228 and for 2004, $34,975. PSR ¶ 13. For ten years in that 18 year period, his taxes were $80,000 or less, still modest for a trial lawyer in what are typically considered "prime" earning years. Only four of the years in the 18 year span were substantial earning years (2007, 2009, 2014 and 2018). PSR ¶ 13. Those four years are outliers.

His modest earnings are the likely result of him working for free or very reduced rates for the many clients who needed help but could not pay a greater fee. In the civil rights contingency fee based aspect of his practice, he was only paid if he won or settled. In the meantime, he had to advance substantial costs to fund pending cases. The nature of his practice as a criminal defense and civil rights lawyer necessarily required frequent court appearances over L.A. County and at times out of state. He was not attentive to the administrative requirements of his office. His debit card statements in discovery reflect numerous insufficient funds transactions over the years. Utility companies would often threaten to shut off lights, water or phones for bills because his account was in arrears.

His earnings primarily were applied to three targets: his ex-wife, and the maintenance of his law practice and family. First regarding his ex-wife, Elouise, their 1999 court ordered divorce agreement obligated him to pay her alimony of $15,000 per month for the first five years, and $20,000 per month thereafter. PSR p. 9 fn2. The documents submitted to the presentence officer (and in the government's discovery) show that by 2014 he was over $2 million in arrears on that debt. He "caught up" in 2015 paying her alimony of $2,007,500. He finally had the money to do so because in late 2014 he settled the Hernandez case. His 1040 tax return for 2014 showed that year he earned $4,163,000 in taxable income. It was his "biggest earning year" in the 18 year span. See PSR ¶ 13.

Secondly, he funded his law practice. Running a contingency practice requires the law firm to advance costs in such cases, which in a lengthy civil case can amount to several hundred thousand dollars, as the law firm pays for depositions, experts, travel, investigation, support personnel, contract counsel and other expenses.

Thirdly, he had substantial family maintenance costs and he was paying the mortgage on his residence/law office building and for Anna and Rebecca's living expenses, as they lived separately prior to 2018. He also supported his father who lived in assisted living until his death in 2013, paid for his children Danita, Akua and Rebecca to attend college, and contributed to the support of his granddaughters who attended private high schools, and then Yale, where Zoie attended college and graduated in 2023. Besides those expenses, there were medical costs for his youngest daughter Rebecca (now 23).

His income year after year was inconsistent. He was in arrears on his alimony payment to Elouise. And his tax debt was a hole that kept getting bigger and bigger. This is evident in that on a total of $4 million in taxes due and owing, he owes another $2.9 million to the IRS in penalties and interest. He tried to negotiate his tax debt with the IRS in 2015 when the numbers were not as big, and made several monthly

payments of $8,334 to the IRS in early 2015, before the offer was rejected and he was advised he did not qualify for the debt compromise program.

## VII.   TRAUMA FROM LOSS OF SON

Several close friends speak of how Mr. Grimes lost focus on the administration of his practice after the loss of his son Akua. Friend of 55 years, psychologist Virginia Watford writes:

> "In 1999, Milton's childhood sweetheart and wife of 32 years dissolved their marriage. Two years later in 2001 his son, Akua, who was only 28 years old, died suddenly. Losses of such significance result in grief reactions that include intense feelings of sadness, anger and guilt. These painful emotions are often overwhelming, not adequately addressed and can go unprocessed for a very long time. His pattern of neglecting to attend to his financial affairs and ignoring the negative consequences of his financial affairs is consistent with my observations of his response to these traumatic events. He has a gift of connecting to his client's pain even as he buries his own.

Exh. 2, pgs. 121-122, Watford, V. PhD Letter; Exh. 2, pgs. 67-69, Lee, N. Letter ("the loss of his son in 2001 was traumatic "his demeanor changed and he mentally lost focus for several years."); Exh. 2, pgs. 1-2, Abarr, M. Letter (describing the loss of Milton's "rock" Elouise in the late 1990s through their split and then divorce, and then the trauma from the death of Akua, "I thought Milton was going to lose his mind over the grief he suffered from that loss. In my view this was 'the other shoe' falling in Milton's life."); Exh. 2, pgs.12-13, Bennett, D., Letter (describing how after Akua's death Mr. Grimes he became more detached from the administrative aspects of his practice, focusing on litigating the wrongs done to his clients.); Exh. 2, pgs. 76-77, Parham, T, CSDH University President, ("believes his neglect of his financial dealings were exacerbated after Akua died, a trauma which shook Milton to his core.).

His close friend and TLC faculty member Kim Savo writes:

"Milton's son died when he was a very young man. It's hard to fathom a parent's grief when they disconnect their child from life support. I believe that Milton never wanted there to be any doubt that his other children or his grandchildren would survive and thrive. And he used all his financial means to ensure that his daughters and grandchildren attended the best schools, that they had private education, college, graduate school."

Exh. 2, pgs. 86-87, Savo, K., Letter.

## VIII.  AGE AND HEALTH

Mr. Grimes is 79 ½ years old. A prison sentence of any length would be a very significant portion of his remaining life.  In addition he has significant health problems [1] which make him more vulnerable to his conditions worsening in a BOP institution, a confined communal setting, where health care is known to be substandard, and where he would lack access to his own medical providers.

Although he is in relatively good health for a 79 ½ year-old black male, he maintains that state of his health by paying attention to his diet, regular exercise, and medical care. Any prison term would likely lessen his longevity, given the poor food, poor medical care, poor sleeping conditions (bunks, dorms, noise, light etc.) and the additional stress of incarceration.

## IX.    APPLICATION OF THE 3553 FACTORS

Here a prison sentence is not necessary to achieve the goals of sentencing. While the crime is serious, it must be weighed against the tremendous weight of mitigating evidence including that: it was not driven by greed and for which he is genuinely remorseful; he has a lifetime of service to others through 50 years of pro bono and low cost legal assistance to many needy people, his contributions to training and inspiring

---

[1]  Mr. Grimes has a number of serious medical conditions for which he seeks regular medical treatment including gout, high blood pressure, hypertension and an enlarged prostate. PSR ¶¶ 72-75. He is prescribed six medications (three for hypertension taken 1 X Day each), one for gout (1x Day), and two for enlarged prostate (1 X Day). PSR ¶¶ 72-75.

attorneys to represent the underserved and underprivileged and mentorship to numerous lawyers and youths in his community, his advanced age and medical conditions.

General deterrence is one consideration at sentencing. Here, however, the defense position is that the other 3553(a) factors weigh so heavily in favor of a probationary sentence that general deterrence on its own should not drive the choice of sentence. The loss of his law license, his calling for 50 years, and the loss of his law practice, his identity, is a devastating consequence. Sharecropper grandparents raised him. He and his sister were the first generation in their family to attend college, and he went on to obtain his Doctor of Law degree and use that degree to fight for social justice. Mr. Grimes worked hard in a lawful endeavor, dedicating his life to social justice causes, mentoring and helping the community, his clients, and the next generation of indigent defense and civil rights lawyers.

Nor does he need to be sentenced to prison to deter him personally from crime. His remorse is profound and genuine.

Probation is an available sentence in this case. It is not prohibited by statute. Further it is not prohibited by the Guidelines as this Court has the power to vary downward to guideline level 11 in Zone B which permits probation with a home detention condition of 9 months which will satisfy the low end of that range pursuant to §5C1.1(e)(3). A probationary sentence will permit him to provide further benefit to the community through community service hours, to continue to provide emotional stability for his daughter Rebecca, and to attend to his own significant health problems.

He will be paying restitution and costs of prosecution for the rest of his life, and that debt burden will preclude him from ever achieving financial stability. Life, even on probation, will be financially challenging for Mr. Grimes and his family.

Here sentencing disparity is not an issue. There are no co-defendants. It would be difficult to compare his circumstances to that of some other defendant in a tax

evasion case, as his circumstances are highly unusual for a tax evader as: he did not have hidden accounts; did not falsify income or expenses; accurately reported his income year after year; and, did not live a greedy or lavish life.

Finally, incarceration is not needed to provide vocational training.

## X.    CONCLUSION

After consideration of the 3553 factors, a sentence of probation[2] with home detention and community service is warranted. Such a sentence would reflect the principles of justice and fairness, allow him to continue serving others through court ordered community service, and actively make amends for his conduct.

Respectfully submitted,

DATED:    January 21, 2025    MCLANE, BEDNARSKI & LITT, LLP

By: /s/ Marilyn E. Bednarski

Marilyn E. Bednarski


WILSON SOSINI GOODRICH & ROSATI


By: /s/ Paul Watford

Paul Watford

Attorneys for Defendant

---

[2]    A sentence of probation of between one and five years is permitted for the crime of tax evasion, as a § 7201 offense does not preclude probation, and is a Class D felony. See Title 18 U.S.C. § 3581(b)(5) and § 3561(a)(2); PSR ¶ 106. Such a sentence is also permitted under the sentencing guidelines with variances downward to adjusted offense level 11 or more, in Zone B.