1  JOSEPH T. MCNALLY
2  Acting United States Attorney
   LINDSEY GREER DOTSON
3  Assistant United States Attorney
   Chief, Criminal Division
4  VALERIE L. MAKAREWICZ (Cal. Bar No. 229637)
5  SARAH S. LEE (Cal. Bar No. 311480)
   Assistant United States Attorneys
6  Major Frauds Section
7        1100 United States Courthouse
         312 North Spring Street
8        Los Angeles, California 90012
9        Telephone:    (213) 894-0756/7407
         Facsimile:    (213) 894-6265
10       E-mail:       Valerie.Makarewicz@usdoj.gov
11                     Sarah.Lee@usdoj.gov

12 Attorneys for Plaintiff
13 UNITED STATES OF AMERICA

14              UNITED STATES DISTRICT COURT
15
16        FOR THE CENTRAL DISTRICT OF CALIFORNIA

17 UNITED STATES OF AMERICA,          No. 2:24-CR-00190-SB

18              Plaintiff,            GOVERNMENT'S SENTENCING
19                                    POSITION; DECLARATION AND
          v.                         EXHIBITS IN SUPPORT
20
   MILTON C. GRIMES,
21                                    Hearing Date:  February 11, 2025
                Defendant.           Hearing Time:  8:00 a.m.
22                                   Location:      Courtroom of the Hon.
23                                                  Stanley Blumenfeld Jr.
24

25        Plaintiff United States of America, by and through its counsel of record, the

26 Acting United States Attorney for the Central District of California and Assistant United

27 States Attorneys Valerie L. Makarewicz and Sarah S. Lee, hereby files its sentencing

28 position for defendant Milton C. Grimes.

1    This position is based upon the attached memorandum of points and authorities,

2    the Declaration of IRS-CI Special Agent Nasir Malik with exhibits, the files and records

3    in this case, and such further evidence and argument as the Court may permit.

4    Dated: January 28, 2025                    Respectfully submitted,

5

6                                               JOSEPH T. MCNALLY
                                                Acting United States Attorney
7                                               LINDSEY GREER DOTSON
                                                Assistant United States Attorney
8                                               Chief, Criminal Division

9                                               _____/s/_____

10                                              VALERIE L. MAKAREWICZ
                                                SARAH S. LEE
11                                              Assistant United States Attorneys

12
                                                Attorneys for Plaintiff
13                                              UNITED STATES OF AMERICA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

DESCRIPTION                                                                                                PAGE

I.      INTRODUCTION ........................................................................................ 1

II.     STATEMENT OF FACTS ........................................................................... 2

III.    PROBATION'S GUIDELINES CALCULATIONS AND
        RECOMMENDATION ................................................................................ 7

IV.     A 22-MONTH SENTENCE IS JUST AND APPROPRIATE ...................... 7

        A.      The Nature and Circumstances of the Offense and the History and
                Characteristics of Defendant ........................................................... 7

        B.      Defendant's History and Characteristics ......................................... 9

        C.      The Need for the Sentence Imposed to Reflect the Seriousness of the
                Offense, Promote Respect for the Law, Provide Just Punishment, and
                Promote Deterrence ........................................................................ 14

V.      TOTAL LOSS AMOUNT AND RESTITUTION .................................... 15

VI.     CONCLUSION .......................................................................................... 17

# TABLE OF AUTHORITIES

DESCRIPTION                                                                  PAGE

## CASES

Spies v. United States,
  317 U.S. 492 (1943) ................................................................................. 8

United States v. Bragg,
  582 F.3d 965 (9th Cir. 2012) ................................................................. 14

United States v. Gall,
  552 U.S. 38 S.Ct. 586 (2007) ................................................................. 10

United States v. Heffernan,
  43 F.3d 1144(7th Cir. 1994) ................................................................... 14

United States v. Josephberg,
  562 F.3d 478 (2d Cir. 2009) ................................................................... 16

United States v. Kellar,
  394 Fed. App'x 158 (5th Cir. 2010) ...................................................... 16

United States v. Kuhlman,
  711 F.3d 1321 (11th Cir. 2013) .............................................................. 11

United States v. Martin,
  455 F.3d 1227(11th Cir. 2006) ............................................................... 14

United States v. Montanari,
  863 F.3d 775 (8th Cir. 2017) ................................................................. 16

United States v. Morgan,
  635 F. App'x 423(10th Cir. 2015) ......................................................... 11

United States v. Musgrave,
  761 F.3d 602 (6th Cir. 2014) ................................................................. 11

United States v. Orlando,
  553 F.3d 1235 (9th Cir. 2009) ............................................................... 14

United States v. Prosperi,
  686 F.3d 32(1st Cir. 2012) .................................................................... 11

United States v. Regensberg,
  635 F. Supp. 2d 306 (S.D.N.Y. 2009) .................................................. 13

United States v. Stefonek,
  179 F.3d 1030 (7th Cir.1999) ................................................................ 11

United States v. Yip,
  592 F.3d 1035(9th Cir. 2010) .................................................................. 8

1

**TABLE OF AUTHORITIES (CONTINUED)**

2

DESCRIPTION                                                                   PAGE

3

**STATUTES**

4

18 U.S.C. § 3553 ................................................................................... 7

5

18 U.S.C. § 3663 ................................................................................. 16

6

26 U.S.C. § 6020 ................................................................................... 3

7

26 U.S.C. § 7201 ................................................................................. 16

8

26 U.S.C. § 7203 ................................................................................. 16

9

28 U.S.C. § 994 .................................................................................. 11

10

**SENTENCING GUIDELINES**

11

USSG § 1B1.3 ..................................................................................... 15

12

USSG § 2T1.1 ..................................................................................... 16

13

USSG § 3D1.2 ..................................................................................... 15

14

USSG § 5H1.2 ..................................................................................... 11

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Concurrent with defendant's career as a respected lawyer in his field, defendant was also a tax cheat. While defendant assisted an underserved population and mentored many within the community, he also callously disregarded his duty to pay taxes that all citizens are required to pay. For almost 30 years, defendant chose to thumb his nose at the countless civil servants who hounded him, year after year, by letter after letter, and call after call, to pay the taxes he legally owed not only to the IRS, but to all Americans. And defendant failed to pay a staggering amount of tax, both federally and to the state of California; the government calculates the total tax loss in the case as $7,234,372.02.

As an attorney for over fifty years, defendant was in a unique position to adjudicate the risks to his behavior. Beginning in 2014, defendant came up with scheme—to lure the IRS into thinking he had no money to pay it. For years, defendant kept millions out of his personal bank accounts that could be used to pay his growing tax debt. Instead, he abused the confidential nature of his client-trust fund account, took out his income and turned it into cashier's checks, which are nearly impossible to trace and leave no record on bank statements. And when defendant's local bank manager asked him why he was converting so much money into cashier's checks, he told her the truth – if the IRS saw he had income, it wouldn't give him a "fair" settlement to pay off his delinquent taxes. Defendant said he was using the cashier's checks to avoid keeping the money in his account, where the IRS could see the true status of his potential collectability.

As in all cases brought before this Court, multiple ideas can be true simultaneously. Defendant can be a respected mentor and attorney. Defendant can also have magnanimous intent in paying the money that should have been paid to the IRS to his ex-wife or children. However, defendant could also be vain or obstinate when he made conscious decisions over decades to spent money that did not belong to him, but rather, belonged to his fellow citizens he was helping.

1    The government considered all these facts, along with defendant's age and the

2    offense calculation under the Sentencing Guidelines, when it offered to cap its

3    sentencing recommendation at 22 months' incarceration, which defendant accepted.  The

4    facts support a 22-month sentence, one that is significantly below the recommended

5    Guidelines calculation, and the government respectfully requests that the Court impose

6    such sentence upon defendant, as such punishment is just, sufficient, and not greater than

7    necessary to uphold the law that defendant violated for 30 years.

8    **II.    STATEMENT OF FACTS**

9    The factual basis of the plea agreement, adopted by the Pretrial Services Report,

10    provides the Court an outline of the offense conduct.  Below are further details for the

11    Court to consider.

12    Defendant's tax problems date earlier than 2002 and pre-date his divorce to Mrs.

13    Grimes. In that year, defendant filed for bankruptcy, In re Milton Charles Grimes, 2:02-

14    bk-25164-BB (C.D. Cal. 2002).  There, the IRS filed a proof of claim for a total amount

15    of \$722,385.16 in unpaid personal income taxes that defendant owed.[1]  Defendant again

16    filed Chapter 7 bankruptcy in 2005 in In re Milton Grimes, 2:05-bk-46024-BB (C.D.

17    Cal. 2005).  On defendant's Schedule F, he estimated owing \$1 million to the IRS and

18    \$250,000 to the Franchise Tax Board.[2]  After her investigation, the Chapter 7 trustee

19    filed a motion to file a no asset report with the Court.  In her declaration, the Chapter 7

20    trustee stated that the IRS had secured tax liens against the defendant/debtor for the

21    period of 1996 through 2004 in the amount of \$1,541,125.86.[3]  At that time, the IRS

22    declined to file a proof of claim in defendant's bankruptcy because there were no assets

23    to distribute to it or other creditors.[4]  During the period of time defendant's bankruptcy

24    _____

25    [1] Declaration of IRS-CI Special Agent Nasir Malik, ¶ 2, Exhibit A (hereinafter Decl.).

26    [2] Id., ECF 4 at 13-14.

27    [3] Decl., ¶ 3, Exhibit B at 4:1-18.

28    [4] Id. at 4:5-8.

2

was pending, October 14, 2005 through March 18, 2010, the IRS was prohibited by the automatic stay from acting to collect.

Since 2002, defendant never filed his taxes on time, and when he got around to doing it, it was years later and never included a voluntary payment with the return. According to IRS transcripts, since at least 1986 -- 38 years -- defendant reported tax due on his return and except for six years, 1991, 1992, 1994, and 2006 through 2008, defendant never included a voluntary payment when submitting his returns to the IRS.[5] And except in 1991, 1992, 2006, and 2008, defendant submitted partial payments of the tax due. In one year, 2011, defendant never got around to filing a return despite earning taxable income, so under the provisions of 26 U.S.C. § 6020(b), the IRS prepared a return for him.[6] In 2013, defendant failed to file.[7]

Even when defendant filed, he didn't disclose much regarding his income to his tax return preparer, Yung. Yung worked with defendant for about 20 years and stated to the IRS that getting documents and financial statements from defendant was like "pulling teeth."[8] Yung remembers that defendant was always late filing his tax returns and has been dealing with IRS collections as long as Yung could remember.[9] Yung recounts defendant being in "panic more" due to the levies issued by the IRS.[10]

Throughout the decades of defendant's failure to pay, the IRS worked to collect his delinquent taxes involuntarily. In 2012, IRS Revenue Officer (RO) Marty McDonald requested defendant complete IRS Form 433-A, Collection Information Statement for

---

[5] Decl., ¶¶ 4, 5, Exhibits C at 6, 7 and D at 17, 19, 22. The IRS transcript is unclear about what defendant reported on his return for 2012—IRS records show defendant's adjusted gross income as -$7,945. Exhibit D at 33-34.

[6] Exhibit D at 29-30.

[7] Id. at 35-36.

[8] Decl., ¶ 6, Exhibit E at 2.

[9] Id. at 1.

[10] Id. at 4.

3

Wage Earners and Self-Employed Individuals, which requested basic information like bank account balances and income earned to assist the IRS in its collection process.[11] At the time, the IRS attempted to collect defendant's 2002 through 5005, 2007, and 2009 delinquent taxes.[12]  In May 2013, RO McDonald issued an administrative summons to defendant for him to appear before her in June 2013 to answer questions and provide documents to aid in collecting his delinquent taxes.[13]  Defendant did not appear on the scheduled summons date.[14]  In July 2013, an attorney for the IRS sent defendant a letter asking him to appear again before the IRS in August, which defendant failed to appear.[15] Then, on September 10, 2013, the United States Attorney's Office sued defendant in this Court to enforce the IRS's administrative summons and appear before the Court to show cause as to why he failed to appear as required.[16]  Judge Gee set an Order to Show Cause hearing for December 13, 2013.[17] At the hearing, defendant appeared and when asked by the Court as to why he did not comply with the IRS's summons, defendant had a one-word answer for the Court: "Ignorance."[18]  The Court ordered defendant to appear before Revenue Officer McDonald on January 15, 2014 and answer her questions and provide her documents requested in the summons.[19]

On January 15, 2014, defendant appeared two hours late for his court ordered meeting with Revenue Officer McDonald, without any documents as commanded in the

---

[11] Decl., ¶ 8, Exhibit G at 1.

[12] Decl., ¶ 9, Exhibit H at 10.

[13] Id. at 11, 13.

[14] Id. at 11.

[15] Id. at 11, 16.

[16] Id. at 1.

[17] ECF 4.

[18] Decl., ¶ 10, Exhibit I.

[19] ECF 8.

4

Court's order and the IRS summons.[20]  She asked questions to orally complete the Form 433-A, but defendant refused to tell RO McDonald his living expenses and stated to her he did not know who his landlord was or how much his rent was.[21]  RO McDonald's impression was that he was not taking the Court's order seriously and acted smug.[22]  RO McDonald gave defendant until January 30, 2014 to provide the information before she would ask the Court for further assistance.[23]  She finally received defendant's signed Form 433-A and his delinquent tax returns for 2010, 2011, and 2012 in mid-February 2014.[24]

Defendant banked with California Bank & Trust. Sherri Harris was the branch manager at the bank's location on Crenshaw Boulevard and met defendant in 2006.[25] Because of internal bank policy, she would need to perform over-rides for his transactions.[26]  In 2015, Harris was told that the bank wanted to terminate its relationship with defendant because of his pattern of purchasing large amounts of cashier's checks.[27] In April 2015, Harris documented a conversation with defendant about the purchase of cashier's checks wherein he stated to her that he was not keeping money in his bank account because he was negotiating with the IRS[28] and "they would not give him a fair

---

[20] Decl., ¶ 11, Exhibit J at 1-2.

[21] Id. at 2.

[22] Id.

[23] Id.

[24] Id. at 4. RO McDonald questioned the veracity of defendant's Form 433-A and asked him to explain certain amounts stated on the form, like how he listed $10,000 in monthly income, but $32,000 in monthly expenses, but received no response.  Exhibit J at 5.

[25] Decl., ¶ 12, Exhibit K at 1.

[26] Id.

[27] Id. at 2.

[28] On January 29, 2015, defendant filed an offer in compromise with the IRS for 2002 through 2005, 2007, and 2009 through 2011, which is an administrative remedy to
*(footnote cont'd on next page)*

5

settlement if they saw the money in his account."[29]  Therefore, according to Harris, he was using cashier's checks as a way to avoid keeping the money in his accounts.[30] Harris stated that defendant had always transacted business in a similar manner and that he would consistently purchase cashier's checks.[31]

In June 2015, Federico Umana, Deputy Bank Secrecy Act (BSA) Officer listed outstanding cashier's checks that defendant purchased but had not been cashed, and sent the list to Todd Peterson, Vice President and BSA Officer for the bank.[32]  Peterson stated that the bank pulled a "background report" as part of the BSA review process that would show outstanding tax liens.[33] In an internal email dated December 7, 2016, Peterson documented defendant's pattern of using cashier's checks to keep the balances of his bank accounts low.[34]  Peterson advised that the bank sever its relationship with the bank by the end of January 2017.[35]

Defendant did take his business elsewhere, and despite a bank refusing to do business with defendant, he remained undeterred in his scheme to hide money via cashier's check.  Instead, defendant opened new accounts with Bank of America on January 30, 2017, and continued purchasing cashier's checks throughout that year until 2020.[36]

Also in 2016, Revenue Officer Warren Siegel continued to investigate sources of income to levy to pay defendant's taxes.  By law, before levying accounts of a taxpayer,

---

settle outstanding tax debt for less than what is owed.  Defendant's offer was rejected in May 22, 2015. Exhibit D at 4, 8, 11, 14, 15, 19, 24, 27, 30.

[29] Decl., ¶12, Exhibit K at 2, 7.

[30] Id. at 2.

[31] Id.

[32] Id., at 4.

[33] Decl., ¶ 13, Exhibit L at 1.

[34] Id. at 3.

[35] Id.

[36] Decl., ¶ 15, Exhibits M and O.

the IRS must notify the taxpayer of its intent to levy, which RO Siegel did.[37]  Siegel levied all accounts he could find relating to defendant. Most of the levy returned with no funds, some with funds that were under $1,000 and one time, a check for $490,069.21.[38]

Finally, defendant's disregard for his legal obligation to pay tax continued with the State of California with the IRS.  As of January 24, 2025, defendant owes personal state income tax to the Franchise Tax Board in the total amount of $1,313,111.47 for years 2014 through 2023.[39]

## III.    PROBATION'S GUIDELINES CALCULATIONS AND RECOMMENDATION

The United States Probation Office calculated defendant's offense level under the Sentencing Guidelines in line with the parties' plea agreement and recommended an 18-month sentence.  ECF 37, 38.

## IV.    A 22-MONTH SENTENCE IS JUST AND APPROPRIATE

Examining the sentencing factors under 18 U.S.C. § 3553(a), in particular the nature and circumstances of defendant's crimes, the need to provide adequate general deterrence, to promote respect for the law, and to avoid unwarranted sentence disparities, demonstrates that a serious custodial sentence is necessary to address defendant's criminal conduct. A below-Guideline sentence of 22 months is sufficient, but not greater than necessary, to achieve these goals.

### A.    The Nature and Circumstances of the Offense and the History and Characteristics of Defendant

Section 3553(a)(1) provides that the Court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant.

---

[37] Decl., ¶ 17, Exhibit P at 72-79.

[38] Id. at 57.

[39] Decl., ¶ 16, Exhibit N.

7

Tax fraud is a serious crime that corrodes the foundation of a functional society. The Supreme Court has long recognized that the "United States has relied for the collection of its income largely upon the taxpayer's own disclosures rather than upon a system of withholding the tax from him by those from whom income may be received." Spies v. United States, 317 U.S. 492, 495 (1943). To provide essential government functions— schools, infrastructure, law enforcement, and social services—it is essential for taxpayers to timely and honestly report their income, self-assess the tax due and owing, and pay over that tax.

For decades, defendant viewed his duty owed to the United States through the timely filing and payment of taxes as a nuisance and wholly optional.  For 22 years, he failed to timely file his tax returns.  To his own tax preparer for as long, defendant never substantiated his income or expenses.  He just provided Yung with numbers to enter on the return.  For close to 38 years, less a handful, defendant owed tax and never remitted payment with his return. When the IRS took legal action against defendant, he gave a rude answer to the Court that he was "ignorant" about the obligation to comply with an IRS summons.  He continued his discourteous "ignorance" when meeting with the Revenue Officer and played games by not telling her basic information about how he lived. He finally "complied" a month after he was ordered to by the Court, and even then, provided questionable information.

As stated in the factual basis, the IRS levied all known accounts owned by him personally over 30 times.  Each time the IRS sent defendant a Notice of Intent to Levy, it was a signal to defendant to remove money from his personal accounts by purchasing cashier's checks.  For example, RO Siegel sent defendant a Notice of Intent to Levy on June 6, 2016, that stated to defendant that IRS would levy in approximately 30 days.[40] Twenty days later, on June 27, 2016, defendant purchased four cashier's checks, each in

---

[40] Exhibit P at 72-73.

the amount of $20,000.[41] Defendant did the same when the IRS sent him a letter on December 5, 2015.[42]  On December 14, 2015, defendant purchased two cashier's checks in his name, one for $72,500 and another for $200,000.[43]

Defendant owes an additional $1.3 million to the State of California for taxes owed starting in 2014 to present.  In United States v. Yip, the Ninth Circuit held that inclusion of state tax loss furthered the goals of the Sentencing Guidelines by holding the defendant accountable for all of the loss he caused through his scheme, and not arbitrarily limiting it to federal tax loss. 592 F.3d 1035, 1038-39 (9th Cir. 2010). Inclusion of defendant's loss to the Franchise Tax Board reflects the gravamen of the harm caused by defendant.

When it came to the duty imposed upon every citizen that earns money in the United States, defendant did what he wanted, when he wanted. Defendant, like many tax cheats, committed his crime simply because he could. He did so because he believed that the IRS would not catch him or uncover the deceit with which he conducted his affairs. And especially as an attorney, defendant was uniquely situated to understand and assess the punitive risks associated with filing to file and pay his taxes.

## B. Defendant's History and Characteristics

The evasion defendant is pleading guilty to is not something that occurred in isolation. For decades, defendant chose to not pay his taxes, despite having money to do so.  Defendant's decision to not pay his taxes was not because he was destitute or lacked the financial means to pay, rather, he made repeated and conscious decisions to spend the money owed to the United States on himself.

By failing to pay his taxes for over 20 years, defendant was able to use and benefit from over $4 million that should have been paid to the government.  Defendant points to

[41] Exhibit M at 3 (Cashier's Checks 114 through 117).

[42] Exhibit P at 76.

[43] Exhibit M at 2 (Cashier's Checks 81 and 82).

9

his alimony and other familial obligations to explain how he didn't spend the money on himself, per se, but on others. These obligations were defendant's; it was his choice to prefer payment of these obligations over the United States. Defendant paid for his granddaughter's private education rather than his taxes. He chose to pay his alimony payment to his ex-wife over the IRS. He chose to voluntarily pay nothing in taxes. And on top of those choices, defendant actively hid money away from the IRS. Looking at the list of 238 cashier's checks he purchased shows an enormous amount of effort defendant dedicated to hiding money from the IRS via cashier's checks. For over six years, defendant went to the bank month after month, sometimes multiple times a month, to purchase cashier's checks. After purchasing cashier's checks, sometimes worth $350,000 to a half a million dollars, defendant would rather bear the risk associated with carrying around a piece of commercial paper worth that much than pay the IRS. The amount of effort it took defendant, year after year, to continue his scheme is staggering and exhausting.

The government acknowledges that California Bank & Trust employees Peterson and Harris both stated that defendant often "recycled" cashier's checks by cashing one to re-purchase others. To minimize his conduct, defendant repeats this theory and provides a declaration of Peter Knudson to attempt to support it. ECF 40-4. Knudson summarily states his conclusion as what he believes the correct amount of money he hid from the IRS via the cashier' checks, from over $16 million to $11.9 million. Knudson provides no calculation or substantiation for the government to review that supports his financial analysis, therefore, the government is unable to review his work or refute it. Without more analysis that the government is able to respond to, the Court should disregard this self-serving conclusory "analysis" by Knudson. Regardless, even the unproven $11.9 million available to defendant would have paid his tax liability at least four-fold.

Unlike most criminal defendants, defendant's legal training and decades of legal experience makes his violation of the tax laws particularly egregious. Defendant knew, or could easily determine, the different penalties associated with his failure to file returns

1   or pay his tax.  Defendant was also uniquely positioned to understand that not every

2   criminal violation of the tax laws is prosecuted.  Defendant made calculated choices,

3   informed by his ability to assess his risk of prosecution.  Defendant's argument that the

4   collateral consequence of losing his law license, which has not occurred or been

5   determined by the State Bar, is the natural consequence of breaking the law himself.

6   What could have a greater impact is defendant's voluntary resignation of his license in a

7   holistic acceptance of his failure to uphold the law.

8       "It has been uniform and constant in the federal judicial tradition for the

9   sentencing judge to consider every convicted person as an individual and every case as a

10  unique study in the human failings that sometimes mitigate, sometimes magnify, the

11  crime and the punishment to ensue." United States v. Gall, 552 U.S. 38, 52, 128 S.Ct.

12  586 (2007) (quotations omitted). On the other hand, the words of the First Circuit vibrate

13  with thunderous resonance: "[I]t is impermissible for a court to impose a lighter sentence

14  on white-collar defendants than on blue-collar defendants because it reasons that white-

15  collar offenders suffer greater reputational harm or have more to lose by conviction."

16  United States v. Prosperi, 686 F.3d 32, 47 (1st Cir. 2012); United States v. Morgan, 635

17  F. App'x 423, 444 (10th Cir. 2015); see also 28 U.S.C. § 994(d) (requiring the sentencing

18  guidelines to be "entirely neutral as to the ... socioeconomic status of offenders"); USSG

19  §§ 5H1.2 ("[e]ducation and vocational skills are not ordinarily relevant in determining

20  whether a departure is warranted"), 5H1.5 ("[e]mployment record is not ordinarily

21  relevant in determining whether a departure is warranted"), 5H1.10 (socio-economic

22  status is "not relevant in the determination of a sentence"). Business criminals are not to

23  be treated more leniently than members of the "criminal class" just by virtue of being

24  regularly employed or otherwise productively engaged in lawful economic

25  activity. United States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir.1999). A diminished

26  sentence based on the collateral consequences would not reflect the seriousness of

27  defendant's offense or effect just punishment.  United States v. Musgrave, 761 F.3d 602,

28  608 (6th Cir. 2014); United States v. Morgan, 635 at 444.

1    Further, defendant's filing history suggests that defendant's knowledge of civil

2    and criminal sanctions was not sufficient to deter him from willfully paying tax owed.

3    Defendant's decision to not pay tax was a calculated decision, based in part on his own

4    calculation of the comparatively low odds of being caught and criminally prosecuted—

5    even still, it took over 20 years for defendant to be prosecuted.  United States v.

6    Kuhlman, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize

7    no special sentencing discounts on account of economic or social status.").

8    Defendant seeks to have the Court look favorably on his evasion of tax because,

9    rather than spend the stolen money on enriching himself, he used the money to pay

10   alimony and family obligations. Defendant is unlike many other citizens in this regard.

11   He was able to meet those obligations, along with finding time for his other charitable

12   endeavors, because he wasn't working to pay his taxes in addition to those debts.[44] That

13   defendant had the time and monetary ability to mentor people and take on charitable

14   matters was borne on the back of the American taxpayer. That's what allowed defendant

15   to do his charitable works; defendant was able to represent defendants for free or low

16   pay, mentor young attorneys, be a "treasure to the community and legal profession"

17   because he wasn't working to meet and pay all of his legal obligations, just the ones he

18   wanted to pay.  He made a choice where to spend his time, and today, he stands in

19   judgment as to those choices.  Having failed to follow the honest path, defendant cannot

20   now decry the consequences.

21   Defendant argues that "only" four years of the twenty at issue were years in which

22   he made substantial earnings, and paints another picture of defendant in arrears with

23   utilities and phone bills with no income to meet basic needs.  ECF 40 17: 8-26. First, it

24   seems that defendant does not discriminate as to which creditor he failed to pay, and

25   second, shows a total disregard as to the consequences of defendant's business model.

26

27   _____

     [44] Defendant's analysis, while conclusory, shows that he paid millions to meet his

28   alimony obligations, with millions still remaining to fully pay his tax obligation as well.

Defendant's apparent poor choices in management of his business and thereafter, his earned income, cannot be used as a shield to protect defendant from punishment.  Even still, it detracts from the fact that defendant <u>had the money</u> to pay the IRS and likely, other creditors, he chose to pay other debt than taxes and services provided to defendant like power and water. Defendant laments how he will forever be hounded by a restitution judgment in an attempt to garner lenience from the Court, but again ignores the facts of the case—<u>defendant had the ability to pay his taxes all along</u>.  He took the chance in not doing so and now, assumes the consequence that is now due to be paid.

Any argument that defendant's admirable qualities justify a non-custodial sentence is misplaced. Indeed, this argument is often presented about white-collar defendants. "The list of their achievements and virtues is long and impressive" and "these offenders appear at their sentencing well-represented and well-prepared, offering ample reasons why the Court should exercise exceptional discretion and show maximum leniency." <u>United States v. Regensberg</u>, 635 F. Supp. 2d 306, 308 (S.D.N.Y. 2009). However:

> the common appeal for leniency tends to understate the gravity of the underlying offenses by compressing the defendant's entire record of misconduct as if it were a single, isolated episode of crime, a one-time or sometime thing that occurred over a lifetime of otherwise immaculate behavior.

> Relevant to this point is that white collar offenders, because of their greater wealth and leadership in the community, enjoy much greater opportunities to participate and rise to prominence in charitable activities, and also possess the means to contribute resources with larger generosity to community service organizations. These social and economic advantages could enable them to gain a substantial edge over blue collar offenders who cannot make claim to comparable means and opportunities with which to mitigate the full impact of a heavy sentence. <u>Id.</u> at 309-10.

While defendant is advanced in years, his age does not mandate that he receive a non-custodial sentence. That notion overlooks the fact that defendant is only pleading guilty at an older age because he successfully evaded paying his taxes for so long.[45]

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, and Promote Deterrence

The Introductory Commentary to Section 2T of the Sentencing Guidelines specifically recognizes that when imposing sentence for tax crimes, general deterrence is a primary concern:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. Part T, Introductory Commentary (November 1, 2012). The Ninth Circuit agrees. United States v. Orlando, 553 F.3d 1235, 1239 (9th Cir. 2009) (affirming an upward variance in tax evasion case because it found that the guideline range "failed to capture tax crimes' particular sensitivity to deterrence"); United States v. Bragg, 582 F.3d 965, 969-70 (9th Cir. 2012) (remanding a probationary sentence for a tax crime where the district court expressed doubts that deterrence works in tax cases and noting that "Congress, in enacting the law, and the Sentencing Commission, in prescribing prison for tax offenses, set out a policy.").

General deterrence is essential in a case like this because it is vital to reducing the ever-increasing amount of money lost through tax fraud. In issuing its sentence, the Court can send an important message to other potential bad actors, along with the scores

---

[45] Taken to its logical conclusion, this argument rewards defendants who managed to evade detection while conversely penalizing those who got caught early.

14

of people who wrote at defendant's behest to the Court. General deterrence is of paramount importance for white-collar offenses such as this one. "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence. Defendants in white collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment." United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation marks, citation, and alterations omitted); see also United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); U.S.S.G. Ch. 1 Pt. A(4)(d) ("[T]he definite prospect of prison [for economic crime], even though the term may be short, will serve as a significant deterrent, particularly when compared with pre-guidelines practice where probation, not prison, was the norm.").

A non-custodial would undercut Section 3553(a)'s goal to promote respect for the law and provide general deterrence. The Government cannot ensure compliance with the Internal Revenue Code if the public believes there are no meaningful consequences for defrauding the public fisc. The defendant's crimes were not committed as part of a brief lapse of judgment; they were committed over many years through consistent and repeated acts of fraud. As a result, he caused serious harm to the United States, and he should be given an equally serious sentence.

## V.   TOTAL LOSS AMOUNT AND RESTITUTION

In determining the base offense level, a court must include all relevant conduct. USSG §1B1.3(a). The Guidelines generally define "relevant conduct" to include "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid

1    detection or responsibility for that offense." USSG § 1B1.3 (a)(1)(A). When there is

2    "jointly undertaken criminal activity," relevant conduct also includes "all acts and

3    omissions of others" that were "within the scope" and "in furtherance" of the jointly

4    undertaken criminal activity and were also "reasonably foreseeable in connection with

5    that criminal activity." USSG § 1B1.3 (a)(1)(B). Relevant conduct further includes "all

6    acts and omissions described in subdivisions (1)(A) and (1)(B) [of USSG § 1B1.3] that

7    were part of the same course of conduct or common scheme or plan as the offense of

8    conviction," but only for "offenses of a character for which §3D1.2(d) would require

9    grouping of multiple counts" – which includes tax offenses sentenced under Part T of

10   Chapter Two of the Guidelines. USSG § 3D1.2(d) (providing that "offenses covered by,"

11   inter alia, "§§2T1.1, 2T1.4, 2T1.6, 2T1.7, 2T1.9, 2T2.1, [and] 2T3.1," "are to be grouped

12   under this subsection"). The commentary to Section 2T1.1 further explains that "all

13   conduct violating the tax laws should be considered as part of the same course of

14   conduct or common scheme or plan unless the evidence demonstrates that the conduct is

15   clearly unrelated."[13] USSG § 2T1.1, comment. (n.2).

16        Defendant has pleaded guilty to evading the payment of his 2014 taxes, but also

17   agreed to relevant conduct as enumerated in the chart in defendant's factual basis.

18   However, the chart only shows the amount of tax he owed for the particular year.

19   Generally, a tax loss calculation cannot include penalties or interest. An exception

20   applies, however, in evasion of payment cases and failure to pay cases. See USSG

21   §2T1.1(c)(1). The commentary to that section provides that "[t]he tax loss does not

22   include interest or penalties, except in willful evasion of payment cases under 26 U.S.C.

23   § 7201 and willful failure to pay cases under 26 U.S.C. § 7203." USSG §2T1.1(c)(1),

24   comment. (n.1). See United States v. Montanari, 863 F.3d 775, 779 (8th Cir. 2017) (no

25   error by district court including penalties and interest in tax loss calculation for evading

26   the payment of tax); United States v. Josephberg, 562 F.3d 478, 502-03 (2d Cir. 2009)

27   (district court did not err by including penalties and interest in tax loss from evasion of

28   payment); United States v. Kellar, 394 Fed. App'x 158, 170 (5th Cir. 2010) (affirming

district court's rejection of defendant's tax loss calculation that did not include penalties and interest).

Attached herein as Exhibit F to the Declaration of IRS-CI Special Agent Malik is a spreadsheet delineating the tax, intertest and penalties currently due for 2002 through 2005, 2007, 2009 through 2011, 2014 through 2023, which amounts to $5,921,260.55.[46] With the state tax loss enumerated above, defendant's total tax loss, both federal and state, including relevant conduct, is **$7,234,372.02**.[47]

Restitution is not mandatory under 18 U.S.C. § 3663A, however, as part of the plea agreement, defendant as agreed to pay restitution pursuant to 18 U.S.C. § 3663(a)(3). ECF 32, p. 2.

## VI.    CONCLUSION

Absent voluntarily reporting and payment of tax, hundreds of billions are lost annually because people like the Defendant—who otherwise enjoy the litany of public benefits that the tax system funds—choose to shirk their responsibilities as taxpayers. Perpetrators of tax frauds, which are lucrative, easy to perpetrate, harmful to all, and difficult to detect, deserve a sentence of incarceration.

The government considered all of defendant's arguments taken in his sentencing position when it offered the plea that defendant ultimately took.  The government's 22-month sentence is far below the Guideline range of 30 to 37 months and represents a serious consideration for the 3553(a) factors highlighted by defendant, along with the 60-

---

[46] Years 2002 through 2005, 2007, and 2009 do not include interest or penalty calculation.  For 2002, 2003, 2006, 2007, the balances due were fully paid, mostly by application of money collected by levy. Exhibit D at 1-9, 17, 19, 20. For 2010 and 2011, the balance due is found on Exhibit D at 24 and 27. For the remaining years, the IRS made an administrative decision to "write off" the balances and therefore, the amount written off by the IRS is included as the unpaid balance of assessments. Exhibit D at 11, 12, 14, 15, 22, 23.

[47] The government failed to timely object to the PSR's calculation of loss in paragraph 31.  The government apologizes to the Court and the parties for this oversight.

letters of support for him.  However, the other facts and factors enumerated by the government herein fully support the imposition of a 22-month sentence.

The obligation to pay taxes is basic to our civilization. It makes it possible to have a lawful society.  American citizens must be able to pay what the government requires. If people don't pay their taxes, they cheat each other. Defendant's choices to not pay taxes cheats the delivery worker, the cashier, the university president, the private investigator, the attorney.  Many are tempted to get ahead of their fellow citizen. However, citizens like defendant must accept that when you cheat, especially to the tune of over $7 million in unpaid tax debt, failing to pay will result in meaningful punishment.  A sentence of 22 months is such a sentence.

Dated: January 28, 2025

Respectfully submitted,

JOSEPH T. MCNALLY
Acting United States Attorney
LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division

    /s/
VALERIE L. MAKAREWICZ
SARAH S. LEE
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

The undersigned, counsel of record for the United States of America, certifies that this brief contains 6488 words in 18 pages, which complies with the word limit of L.R. 11-6.1. and complies with the page limit set by the Court's Criminal Standing Order.

Dated: January 28, 2025                    Respectfully submitted,

                                           JOSEPH T. MCNALLY
                                           Acting United States Attorney
                                           LINDSEY GREER DOTSON
                                           Assistant United States Attorney
                                           Chief, Criminal Division

                                           /s/
                                           VALERIE L. MAKAREWICZ
                                           SARAH S. LEE
                                           Assistant United States Attorneys

                                           Attorneys for Plaintiff
                                           UNITED STATES OF AMERICA